# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **CLARENCE MARCUS FOSTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:21-cv-00737** |
| | ) | **Judge Aleta A. Trauger** |
| **MASTEC NORTH AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Plaintiff Clarence Foster brings a single-count Complaint against defendant MasTec North America ("MasTec") under the Tennessee Public Protection Act ("TPPA"), for terminating his employment "solely because of his refusal to remain silent and participate in" the defendant's illegal activities. (Doc. No. 1 ¶ 4.) Each party has now filed a Motion for Summary Judgment (Doc. Nos. 30, 41) seeking judgment as a matter of law on that claim, and each party opposes the other's motion. For the reasons set forth herein, both motions will be denied.

## I. LEGAL STANDARD

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion

for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Ferro Corp. v. Cookson Grp., PLC*, 585 F.3d 946, 949 (6th Cir. 2009); *Taft Broad. Co. v. United States*, 929 F.2d 240, 241 (6th Cir. 1991). On cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft*, 929 F.2d at 248.

## II.    THE TPPA

The TPPA, also referred to as Tennessee's "Whistleblower Act," provides a cause of action for any employee " discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b). Tennessee courts recognize a distinction between "(1) discharge in retaliation for refusing to *remain silent* about illegal activities, usually referred to as 'whistleblowing,' and (2) discharge in retaliation for refusing to *participate in* illegal activities. The claims are similar but distinct." *Williams v. City of Burns*, 465 S.W.3d 96, 110 (Tenn. 2015) (citation omitted; emphasis in original). Both types of TPPA claims have four elements: (1) the plaintiff was an employee of the defendant; (2) the plaintiff either refused to participate in or refused to remain silent about illegal activity; (3) the defendant

employer terminated the plaintiff's employment; and (4) the defendant terminated the plaintiff's employment solely because the plaintiff engaged in the protected activity. *Id.* at 111.

The statute codifies the application of the *McDonnell Douglas* burden-shifting analysis to TPPA claims, both at trial and on summary judgment, as follows:

> In any civil cause of action . . . alleging retaliation for refusing to participate in or remain silent about illegal activities, the plaintiff shall have the burden of establishing a *prima facie* case of retaliatory discharge. If the plaintiff satisfies this burden, the burden shall then be on the defendant to produce evidence that one (1) or more legitimate, nondiscriminatory reasons existed for the plaintiff's discharge. The burden on the defendant is one of production and not persuasion. If the defendant produces such evidence, the presumption of discrimination raised by the plaintiff's *prima facie* case is rebutted, and the burden shifts to the plaintiff to demonstrate that the reason given by the defendant was not the true reason for the plaintiff's discharge and that the stated reason was a pretext for unlawful retaliation.

Tenn. Code Ann. § 50-1-304(f).

To establish a *prima facie* case at the summary judgment stage, the plaintiff must present evidence "that he engaged in conduct protected by the TPPA, that the protected conduct was known to the defendant, that the defendant thereafter discharged him, and that there was the requisite causal connection between the protected conduct and the discharge." *Williams*, 465 S.W.3d at 113. To show that he engaged in protected activity for purposes of a whistleblowing claim, the plaintiff must show that he "reported the employer's illegal activity and that the 'reporting of the illegal activity furthered a clear public policy.'" *Haynes v. Formac Stables, Inc.*, 463 S.W.3d 34, 37 (Tenn. 2015) (quoting *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777, 788 (Tenn. 2010)). A refusal to participate claim does not require the employee to show that he reported the illegal activity. *Id.* at 37 n.3.

III.    **MASTEC'S MOTION FOR SUMMARY JUDGMENT**

A.    **Factual and Procedural Background**

The court will focus here on the facts that are relevant to, and undisputed for purposes of, the defendant's motion, which argues only that Foster did not "report" the alleged illegal activity to anyone other than a person "responsible for the conduct." (Doc. No. 42, at 1.)

MasTec is "an infrastructure construction company." (Doc. No. 1, Compl. ¶ 3; Doc. No. 13, Answer ¶ 3.) Plaintiff Marcus Foster was employed by MasTec from August 26, 2019 until September 29, 2020. (Compl. ¶¶ 5, 6; Answer ¶¶ 5, 6.) He was employed by MasTec as a CDL Driver/Operator. (Compl. ¶ 8; Answer ¶ 8.)

On September 28, 2020, MasTec was retained by a customer to lay fiber optic cables at a jobsite at or around 208 Gallatin Pike (the "Gallatin Pike jobsite"), within Metropolitan Nashville and Davidson County, Tennessee ("Metro").[1] The plaintiff's duties on this project "included driving various machinery and equipment to this Gallatin Pike job site." (Compl. ¶ 10; Answer ¶ 10.)

In the course of working on this project, a MasTec employee named Nate Rudiman struck a Metro sewer pipe with a piece of machinery, making a hole in it, causing sewage to flow out of the pipe. (Doc. No. 44-1, Foster Dep. 167–68.[2]) After that, according to the plaintiff, there were "no discussions about what to do next," and he just "did was [he] was told to do." (*Id.* at 171.) Specifically, he was instructed to "suck the water up out of there" with a "vac," and when the "vac

---

[1] The statements for which no citation is provided are drawn directly from the plaintiff's Response to the Defendant's Statement of Undisputed Material Facts ("SUMF") (Doc. No. 50) and are undisputed for purposes of the defendant's Motion for Summary Judgment.

[2] The deposition transcripts filed in this case are in condensed format, with four transcript pages per actual page. The court cites the original transcript pagination rather than to the page numbers assigned by CM/ECF.

filled up, they had me run that one to American Farms.[3] I took it to American Farms, and I dumped it." (*Id.*) When Foster got back to the jobsite an hour and a half later, the scene was "just chaos." (*Id.* at 174.) The plaintiff states that, the second time a vac was filled, he refused to take it and dump it illegally, so Rudiman and Supervisor Terry Jones took it somewhere. (*Id.* at 182–83.) Rudiman was the jobsite foreman on the project. (Doc. No. 35, Foster Decl. ¶ 6.) Jones was Rudiman's supervisor. (Foster Dep. 186.)

Using his cell phone, Foster made multiple video recordings of the events taking place on the jobsite between 3:26 and 4:14 p.m. on September 28, 2020. (Foster Decl. ¶ 22.) Other employees, including Jones, were aware that he was making videos and taking pictures. (*Id.*) The plaintiff claims that video recordings show that he "loudly narrate[s]" commentary and "observations of employees performing misconduct in violation of the law and policy." (*Id.* ¶ 23.)

Foster alleges that he reported illegal activity to Construction Manager Logan Emery when he showed Emery a video of MasTec employees performing "illegal operations" at the Gallatin Pike jobsite on September 28, 2020 and "clearly reported claims that [he had] observed 'illegal activity' at Gallatin Pike," thus "alert[ing]" Emery that Rudiman and Jones had engaged in illegal conduct in their handling of the sewage spill. (*Id.* ¶ 26.) Foster alleges that he made a second report to Emery about violations of law and policy and showed him a second video in connection with the sewer spill on September 29, 2020. (*Id.* ¶ 36.) Immediately after Foster made this second report, Emery fired him. (*Id.*) There is no dispute that Emery was the only supervisor to whom Foster reported the alleged illegal activity occurring at the Gallatin Pike jobsite.

---

[3] "Vac" is short for "vactron," which is a trailer-mounted suction device and tank, "used for collecting water typically used for directional drilling by MasTec." (Doc. No. 44-5, Emery Decl. ¶ 30.)

In September 2020, Emery was employed by MasTec as a Construction Manager, and, in this role, he was considered a "management-level employee of MasTec." (Doc. No. 44-3, Emery Dep. at 14–15.) He reported directly to Director of Operations Wayne Stine, who reported to Senior Vice President Mike Beggs. (*Id.* at 11–12.) As Construction Manager, Emery was assigned to oversee a "specific project or two within one office." (*Id.*) The construction supervisors over those projects, including Terry Jones, reported to him. (*Id.* at 13.) Crew foremen (like Rudiman) reported to supervisors. (*Id.* at 14.)

As Construction Manager, Emery was ultimately "responsible for MasTec's work at each of the jobsites where work was being done on" a particular project. (Doc. No. 44-5, Emery Decl. ¶ 12.) He was responsible for the project of which the Gallatin Pike jobsite was part. (*Id.* ¶ 13.) He was responsible "for the daily activities occurring on [his] assign[ed] project's jobsites, such as each project's progress, costs, and any personnel issues." (*Id.* ¶ 14.) He had supervisory authority over Foster. (*Id.* ¶ 16.) Emery's written job description states that the Construction Manager functions as "project manager," "provides management and direction of utility construction activities," and "take[s] responsibility for all personnel and any vehicles or equipment in their control." (Doc. No. 44-5, at 8.)

In response to an Interrogatory served by the defendant, Foster identified Emery as an employee of the defendant who had engaged in unlawful conduct, and he further alleged that Emery was the "Project Manager that directed clean-up of job site and was aware of the dumping of the sewer waste down a Metro Nashville stormwater drain." (Doc. No. 44-2, at 3.)

However, it is also undisputed that Emery was not present on the jobsite on September 28 or 29, 2020. (Emery Dep. 51, 146.) There is no suggestion that Emery was aware of the alleged illegal pumping of sewage at that site until Foster alerted him to it. (Foster Dep. 196–97.)

Accordingly, Emery was not personally involved in, and did not direct, any of the illegal activity that purportedly took place at the Gallatin Pike jobsite. The plaintiff claims that the individuals who were directly responsible for the illegal activity were Crew Foreman Nathan Rudiman and Supervisor Terry Jones. (Foster Decl. ¶¶ 6, 8–11, 15.) From the plaintiff's perspective, Emery was a "higher-ranking off-site manager who was not present when the utility was damaged, and he was not directly involved in the misconduct at Gallatin Pike." (*Id.* ¶ 17.)

### B.    The Defendant's Motion

In its summary of its argument, the defendant asserts that, to prevail on a TPPA claim, the plaintiff "must demonstrate that he refused to participate in or remain silent about illegal activity" and that, "to meet this burden," he must "prove that he reported his concerns of illegal activity to someone other than the person ***responsible for the conduct***." (Doc. No. 42, at 1 (emphasis in original).) MasTec contends that Emery was "responsible for the alleged illegal activity both by virtue of his position and because Plaintiff has directly accused him of participating in the alleged illegal activity." (*Id.*) Although the defendant conflates the TPPA claims based on refusal to participate and refusal to maintain silence in this section of its brief, elsewhere it characterizes the plaintiff's claim solely as a whistleblower claim. (*See id.* at 3–4.) Regardless, the defendant seems to believe that, for both claims, the plaintiff must establish that he "reported" the illegal activity. (*See id.* at 4.) The entirety of the defendant's legal argument is devoted to arguing that the plaintiff's TPPA claim fails, because his alleged report of illegal activity to Emery was insufficient as a matter of law.

In response, the plaintiff cites the same legal authorities as the defendant and argues that his report to Emery was sufficient as a matter of law. He also contends that his interrogatory answer asserting that Emery "directed clean-up of job site and was aware of the dumping of the sewer waste down a Metro Nashville stormwater drain" (Doc. No. 44-2, at 3) cannot be read to imply

that Emery was directly involved in the conduct that the plaintiff reported to him, in light of all of the other evidence in the record. Rather, the plaintiff's answer should be understood as articulating his suspicion that Emery had some involvement in cleaning up the jobsite after the plaintiff reported wrongdoing to him (and was fired). (*See* Doc. No. 46, at 17–18.) The plaintiff argues that, at most, his interrogatory is an unsubstantiated accusation rather than actual evidence of Emery's involvement. (*Id.* at 18.)

Finally, the plaintiff argues that the defendant's Motion for Summary Judgment does not address the "refusal to participate" aspect of the TPPA claim, as articulated in his Complaint, as a result of which that claim must proceed to trial regardless of whether the court rules in the defendant's favor on the whistleblower claim.

The defendant's Reply largely reiterates the arguments made in its opening Memorandum and adds two new arguments: (1) that Foster was not "acting in furtherance of the public interest" in making his reports to Emery, because he admitted he was acting mostly to protect himself; and (2) he failed to plead a refusal to participate claim and "cannot satisfy the substantive elements of a refusal-to-act claim." (Doc. No. 49, at 6, 7.) MasTec argues that Foster cannot point to any illegal activity in which he refused to participate or that his termination was causally related to such refusal.

## C.    Discussion

### 1.    Refusal to Participate Claim

As an initial matter, the defendant may very well be correct that the plaintiff fails to adequately plead a TPPA claim based on a refusal to participate in illegal activities and that he would not be able to provide factual support for such a claim. However, the Complaint clearly alleges that the plaintiff was terminated in retaliation for his "refusal to remain silent about, and refusal to participate in, Defendants' illegal activities," and it articulates a TPPA claim based on

termination of the plaintiff's employment "solely because of his refusal to remain silent and participate in Defendant's violations." (Doc. No. 1 ¶ 16 & p. 4.) MasTec did not move for the dismissal of this claim under Rule 12(b)(6). In addition, although it now seeks summary judgment on the claim, it did not include facts related to the refusal to participate claim in its SUMF, and it did not raise an argument addressed to this claim until it filed its Reply brief.

Generally speaking, arguments raised for the first time in reply briefs are waived, both for purposes of appeal and on motions for summary judgment in the district court. *Palazzo v. Harvey*, 380 F. Supp. 3d 723, 730 (M.D. Tenn. 2019) (Crenshaw, J.) (citing *Ryan v. Hazel Park*, 279 F. App'x 335, 339 (6th Cir. 2008)). As the Sixth Circuit has explained:

> Raising the issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration. Further the non-moving party ordinarily has no right to respond to the reply brief, at least not until oral argument. As a matter of litigation fairness and procedure, then, we must treat [such issues] as waived.

*Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008).

Of course, a litigant is entitled to address "new arguments presented in a response brief." *Matthews v. Wells Fargo Bank*, 536 F. App'x 577, 579 (6th Cir. 2013). In this instance, however, the plaintiff did not present a new argument so much as point out that the defendant's Motion for Summary Judgment is actually a motion for partial summary judgment, as it does not address all of the grounds for relief set forth in the Complaint. Under these circumstances, the court declines to consider the defendant's arguments in its Reply for the dismissal of the plaintiff's "refusal to participate" claim, to which the plaintiff has not had an opportunity to respond.

To be clear, the defendant has not waived objection to this part of the plaintiff's claim. It has simply waived the opportunity to move for summary judgment on the claim. Summary judgment on the "refusal to participate" claim will, therefore, be denied.

2.      *Refusal to Remain Silent Claim*

As set forth above, the only argument the defendant raises in its initial brief is that the plaintiff's report of allegedly illegal activity to Emery did not satisfy his reporting obligation. In its Reply brief, MasTec tacks on an argument that Foster was not "acting in furtherance of the public interest" in making his reports to Emery, because he admittedly was acting to protect himself. (Doc. No. 49, at 6.) The court declines to address that argument, to which the plaintiff has not had an opportunity to respond, but nonetheless notes that there appears to be a question of fact as to the plaintiff's motivations for making the video recordings.

The court also rejects the defendant's argument that the report to Emery was insufficient. In *Haynes v. Formac Stables, Inc.*, 463 S.W.3d 34 (Tenn. 2015), the Tennessee Supreme Court considered whether an employee's report to the person engaged in the allegedly illegal activity satisfied the TPPA's reporting requirement. In deciding that issue, the court pointedly did *not* overrule a previous holding by the Tennessee Court of Appeals that an employee may satisfy the TPPA's reporting requirement by making a report internally to "company management." *Id.* at 37 (citing *Merryman v. Cent. Parking Sys., Inc.*, No. 01A01-9203-CH-00076, 1992 WL 330404, at *7 (Tenn. Ct. App. Nov. 13, 1992), *abrogated on other grounds by Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 537 (Tenn. 2002)). It did, however, overrule an appellate court decision holding that an internal report of sexual harassment to the same supervisor who was subjecting the plaintiff to harassment satisfied the reporting requirement. *Id.* at 38 (citing and overruling *Emerson v. Oak Ridge Rsch., Inc.*, 187 S.W.3d 364 (Tenn. Ct. App. 2005)). In *Haynes*, the court "adopt[ed] a rule that uniformly requires employees to report illegal activity to *someone other than the offending party*—which will necessarily be an outside entity when, as here, the offending supervisor, the sole manager, and the company owner are the same person." *Id.* at 39 (emphasis added); *see id.* at 40 ("[T]he public policy underlying the whistleblower protections precludes relief for an employee

who merely reports unlawful activity to the person responsible, even when that person is the manager, owner, or highest authority within the company.").

In other words, reporting to Emery, a management employee who was superior to the individuals allegedly engaged in illegal activity and who was not, himself, engaged in—or even aware of—the illegal activity, satisfies the rule adopted in *Haynes*. The defendant, however, argues that reporting to Emery was not sufficient, because Emery was ultimately responsible for whatever happened at the Gallatin Pike jobsite and because the plaintiff himself alleges that Emery was engaged in wrongdoing.

As for the plaintiff's statements in his interrogatory answer that Emery was engaged in illegal activity, the court finds at this stage in the proceedings that the plaintiff's bare allegations do not count as proof that Emery was engaged in illegal activity *at the time* the plaintiff allegedly reported illegal activity *by other employees* to him. It is undisputed that Emery was not at the jobsite and was not aware of the fractured sewer line or the on-site supervisors' response to the accident until the plaintiff told him about it.

As for MasTec's argument that Emery was "responsible" for the illegal activity simply by virtue of being responsible for ensuring that the sewer line breach at one of his jobsites was addressed appropriately, the defendant relies on a number of cases, mostly federal district court cases. The cases cited by the defendant, however, are either factually distinct, do not adequately consider the question of what it means to be "engaged" in the allegedly wrongful activity, predate *Haynes*, or simply reiterate *Haynes'* holding.[4] None of these cases persuades the court that a report

---

[4] *See, e.g.*, *Mofield v. Rich Prod. Corp.*, No. 3:16-CV-00033, 2018 WL 3364370, *4 (M.D. Tenn. July 10, 2018) (Campbell, J.) (granting the defendant's motion for summary judgment on the plaintiff's TPPA claim based on the plaintiff's reporting of illegal activity to supervisors responsible for addressing the alleged illegal activity and adopting, with no analysis, an overly broad view of what it means to be "engaged" in wrongdoing); *Veard v. F & M Bank*, No. 3:15-

to Emery was legally insufficient. By alleging that he reported illegal activity by lower-level supervisory employees to Emery, a management-level employee one or two steps above them in the corporate chain, the plaintiff has, at the very least, created a material factual dispute as to whether he satisfied the TPPA's "reporting" requirement. *Haynes* expressly acknowledged that "internal reporting to superiors of illegal actions by other employees" can constitute protected activity. *Haynes*, 463 S.W.3d at 40 (quoting *Drummond v. Land Learning Found.*, 358 S.W.3d 167, 171 (Mo. Ct. App. 2011), and citing *Lykins v. CertainTeed Corp.*, 555 F. App'x 791, 794 (10th Cir. 2014)). That is what Foster did here. Although Emery was ultimately responsible for ensuring an appropriate response to a sewer line breach on a project that he was managing, he knew nothing about the breach and had not himself been engaged in any illegal activity when the plaintiff allegedly reported it to him. The situation would be different if, for example, Foster had complained to Emery about *Emery's response*—or failure to respond appropriately—to the incident at the Gallatin Pike jobsite.

MasTec's only asserted basis for summary judgment on the TPPA whistleblower claim is that the plaintiff's report to Emery was insufficient. Because the report to Emery satisfied *Haynes*, the defendant's Motion for Summary Judgment of the TPPA whistleblower claim will be denied.

---

CV-0498, 2016 WL 645309, at *6 (M.D. Tenn. Feb. 18, 2016) (Trauger, J.) (holding that the plaintiff's common law whistleblower claim failed because the only internal reports the plaintiff made of potentially illegal activity were to the individuals responsible for the allegedly illegal activity), *aff'd sub nom. Veard v. F&M Bank*, 704 F. App'x 469 (6th Cir. 2017); *Hugo v. Millennium Laboratories, Inc.*, 993 F. Supp. 2d 812, 823, 824 (E.D. Tenn.) (stating, pre-*Haynes*, that a TPPA claim required the plaintiff to "complain to someone other than his employer" but also finding that the plaintiff did not identify illegal conduct in which his employer had engaged or report such illegal activity to anyone), *aff'd*, 590 F. App'x 541 (6th Cir. 2014); *Tidwell v. Holston Methodist Federal Credit Union*, No. E2019-01111-COA-R3-CV, 2020 WL 3481537, *3, *4 (Tenn. Ct. App. June 25, 2020) (affirming dismissal of the TPPA claim where the plaintiff failed to "identify any sections of the Tennessee or United States Code or any regulations intended to protect the public health, safety, or welfare" and "had not reported the illegal activity to anyone other than the person responsible for the activity" (quoting *Haynes*, 463 S.W.3d at 40)).

## IV.    THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### A.    Facts

The plaintiff asserts that *he* is entitled to summary judgment on his TPPA whistleblower claim.[5] He claims that there are no material factual disputes as to each of the elements of his *prima facie* case of TPPA retaliation: that he was employed by MasTec; that he engaged in protected activity when he reported illegal activities to Emery; and that Emery fired him for reporting, and making video recordings of, the illegal activity. The plaintiff also asserts that the defendant's proffered non-retaliatory motive for his termination—plaintiff's making video recordings in violation of company policy—has been "disproven and discredited." (Doc. No. 31, at 17.) For purposes of the *plaintiff*'s Motion for Summary Judgment, the relevant facts, viewed in the light most favorable to MasTec, are as follows.

On Monday, September 28, 2020, MasTec was engaged in laying fiber optic cables at the Gallatin Pike jobsite.[6] This project required, among other things, the performance of excavation operations close to where utilities owned and operated by the Metro are located—specifically sewer pipes and stormwater drains. Crew Foreman Nathan Rudiman and Supervisor Terry Jones were both at the jobsite and providing direction to the work crew assigned to the project, including plaintiff Marcus Foster. (Doc. No. 44-1, Foster Dep. 36–37, 185–86.)

Rudiman, while excavating near a sewer pipe, accidentally struck and breached the pipe, causing raw sewage to flow from the fractured utility and into the hole that MasTec was

---

[5] The court does not construe the plaintiff's motion as seeking summary judgment on his TPPA claim based on a purported refusal to participate in illegal activity. (*See* Doc. No. 31, at 2 ("Plaintiff's conduct was a protected refusal to remain silent.").)

[6] The statements set forth here for which no citation is provided are drawn directly from the defendant's Response to the Plaintiff's Statement of Facts (Doc. No. 39) or the plaintiff's Response to MasTec's Statement of Additional Facts (Doc. No. 48) and are undisputed for purposes of the plaintiff's Motion for Summary Judgment.

excavating. Foster witnessed the breach. He was directed to use the "vac" to suck up the water and then to drive the vac to a dump site called "American Farms" once the fac was full, which he did. (*Id.* at 171.) Upon his return, Foster observed his co-workers attempting to fix the leak with the assistance of James "Bobo" Lynch. Lynch is a contractor who routinely performs work at MasTec jobsites, but he is not a MasTec employee. When another vac was filled, the plaintiff learned that the vac would be dumped at some other location. The plaintiff admits that he does not know if there were other appropriate and legal dumping locations nearby and does not know where the vac was dumped. (Foster Dep. 179–82.) There nonetheless seems to be no dispute that the plaintiff believed that his supervisors' handling of the breach was illegal in many different ways.

The plaintiff made multiple video recordings of the activities at the Gallatin Pike jobsite between 3:26 p.m. and 4:14 p.m. on September 28, 2020, using his cell phone. The plaintiff was aware that MasTec has a "Recordings in the Workplace" policy ("Recording policy"). (Foster Decl. ¶¶ 18, 20–21.) The Recording policy states, in relevant part, that "employees are prohibited from making surreptitious, unauthorized, or secretive audio or video recordings"; recording or photographing "Confidential Information," as that term is defined in the employee handbook; violating the privacy rights of customers, clients, employees or vendors on Company property; or making a recording that would "violate other Company policies (such as anti-harassment, anti-workplace violence." (Doc. No. 32-18, at 1.) Otherwise, making recordings "in support of concerted, mutual aid and protection" is not prohibited. (*Id.*)

The plaintiff asserts that his video recordings on September 28 and 29, 2020 were not "surreptitious, unauthorized, or secretive," because he was openly using his phone to record the events, and other employees saw him doing this. (Doc. No. 35, Foster Decl. ¶ 22.) He testified that his intention in making the videos, at least in part, was for the purpose of reporting a unsafe

conditions to protect the company and other employees. (Foster Dep. 290.) He also confirmed that he made these videos at least in part to protect himself, because he did not want to be personally implicated in any illegal activity. (*See id.* at 191–92 (affirming that he was making videos to "protect [him]self," because, as he stated, "I'm an ex felon. I was still seeing a probation – a supervisor. So, yes. Anything of that nature was potentially harmful to me.").)

The plaintiff left the Gallatin Pike jobsite sometime after 4:15 p.m. and went to the MasTec facility on Bush Road, before going home for the day. Once there, he located Logan Emery. Emery described his encounter with Foster as follows:

> On the 28th, mid- to late afternoon, [I] was headed to the bathroom . . . . On my way to the bathroom . . . , I get confronted by Mr. Foster in the hallway with a phone being shoved in my face. All I saw was MasTec hardhats, so I knew it was MasTec employees . . . .
>
> So I proceeded to walk to the bathroom, and all I saw was – I didn't watch the duration of the video; it was only the first couple of seconds . . . .
>
> Leaving the bathroom, Mr. Foster was gone and did not go to my office to wait for me or anything like that. So that was the last time I saw [Foster] that day.

(Doc. No. 44-3, Emery Dep. 32.) According to Emery, Foster did not say anything to him and specifically did not explain to Emery what he was trying to show him on his cell phone. (*Id.* at 32–33.) Emery did not see anything "out of ordinary" during the few seconds of video. (*Id.* at 35.) "It was a hole in the ground, which is our line of work." (*Id.*) He was aware only that it was a video of MasTec employees performing work at a MasTec jobsite. (*Id.*) He did not attempt to probe Foster, because he "had to use the bathroom," and Foster was gone when he came out. (*Id.* at 36, 32.) In short, according to Emery, Foster did not provide him with any context or information about the content of what the cell phone recording purportedly reflected, and he had no understanding at the time of what the video was intended to show. (*Id.* at 31.) It is undisputed that,

at this point, no one else had informed Emery about any problems or illegal acts at the Gallatin Pike jobsite.

The court has viewed the 4:14 video. It depicts a hole in the ground with what appears to be muddy water filling the bottom of it and a construction worker, now identified as Lynch, using the "vac" to suck the muddy water out of the hole. (*See* Doc. No. 34, plaintiff's manually filed Ex. 6.) Eighteen seconds into the video, the camera pans to the left and shows the vac, and the plaintiff (or someone) can be heard stating: "That vac right there." (*Id.*) Beginning approximately twenty seconds into the video, someone says: "Don't see no Metro or nobody—ain't no Metro around."

Emery testified that, after seeing just the first few seconds of the 4:14 video, he concluded that the plaintiff had once again made videos of his co-workers, an issue that Emery had addressed with him on two previous occasions. According to Emery, he was aware that Foster had made a video recording of a co-worker named Wilson in October 2019, because Foster showed Emery the video and accused Wilson of "throwing a chain at him." (Doc. No. 44-5, Emery Decl. ¶ 3.) Emery was in the role of Construction Supervisor at the time and directly supervised field employees on the jobsite to which he was assigned, including Foster. (*Id.* ¶ 4.) On viewing the video, Emery determined that Foster was exaggerating the incident and had no reason to film Wilson in the first place. He also concluded that the video violated MasTec's Recording policy. (*Id.* ¶¶ 5–6.) According to Emery, Foster's recording of the video was antagonistic and divisive. He told Foster that the conduct violated MasTec's Recording policy and instructed him not to make similar videos in the future. (*Id.* ¶ 8.)

Shortly after this incident, Emery was promoted to Construction Manager. In that role, he learned in July 2020 that Foster had emailed Debbie Angstadt to complain about unprofessional workplace conduct, bullying, favoritism, and abuse of authority. Several photographs, a video

recording, and an audio recording were attached to the email. (*Id.* ¶ 17.) Angstadt forwarded these documents to Regional Human Resources Manager Dena Rand for investigation. Rand contacted Emery, and they had a conference call with Foster to discuss the concerns raised in the email and to make a plan for moving forward. (*Id.* ¶¶ 18–21.) In addition, Foster was counseled during this call for violating MasTec's Recording policy in relation to the pictures and recordings he had sent to Angstadt. According to Emery, Foster was given a verbal warning for this violation. (*Id.* ¶ 22.) Foster denies that he was ever counseled or reprimanded for making video recordings and denies that any of his recordings violated the Recording policy. (Foster Decl. ¶¶ 20–21, 38.)

Emery states that, when Foster "shoved his cell phone in [Emery's] face" on September 28, 2020, Emery was frustrated that Foster had "once again made a video recording of his coworkers" after having just been counseled about doing that in July. (*Id.* ¶ 39.) Emery called Rand and told her that Foster had once again violated MasTec's Recording policy. During this telephone call, Emery made the decision to terminate Foster's employment. (*Id.* ¶¶ 40–41.) Emery met with Foster to notify him of his termination on September 29, 2020. (*Id.* ¶ 42.)

According to Emery, the only video Foster showed him on September 28 or 29, 2020 was the same 4:14 video, of which Emery watched only the first few seconds. He denies that Foster ever showed him a video of sewage water or any other liquid being pumped down a stormwater drain. The first time Foster talked to Emery about sewage being pumped down a stormwater drain was when Emery walked Foster to his car following his termination on September 29, 2020. (*Id.* ¶¶ 43–45.) Emery expressly denies Foster's allegations that Emery said something like, "Man, you can't be doing this. . . . This is illegal . . . . Man, Foster, you can't be making recordings of illegal activity . . . ." (*Id.* ¶ 46.) Emery also affirmatively avers that he did not tell Foster he was being

terminated for making recordings of MasTec employees performing illegal acts during the termination meeting on September 29, 2020, or at any other time. (*Id.* ¶ 47.)

**B.      Discussion**

As set forth above, a TPPA whistleblower claim requires the plaintiff to prove four elements: (1) that he was employed by the defendant; (2) that he refused to remain silent about illegal activity; (3) that he was discharged; and (4) that he was terminated *solely* for refusing to remain silent. *Williams v. City of Burns*, 465 S.W.3d 96, 111 (Tenn. 2015). To establish a *prima facie* case at the summary judgment stage, the plaintiff must present evidence "that he engaged in conduct protected by the TPPA, that the protected conduct was known to the defendant, that the defendant thereafter discharged him, and that there was the requisite causal connection between the protected conduct and the discharge." *Williams*, 465 S.W.3d at 113. To show that he engaged in protected activity for purposes of a whistleblowing claim, the plaintiff must show that he "reported the employer's illegal activity and that the 'reporting of the illegal activity furthered a clear public policy.'" *Haynes v. Formac Stables, Inc.*, 463 S.W.3d 34, 37 (Tenn. 2015) (quoting *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777, 788 (Tenn. 2010)).

While it is undisputed that the plaintiff was employed by MasTec and that he was terminated, most of the other relevant facts are disputed. As set forth above, regardless of whether MasTec's employees were engaged in illegal activity at the Gallatin Pike jobsite and irrespective of what the plaintiff believed he was doing, there is a material factual dispute as to whether he "reported" illegal activity to Emery. According to Emery, the plaintiff showed him a few seconds of a video, which Emery did not perceive as showing illegal activity. According to Emery, he had no reason to believe on September 28 that Foster had refused to participate in illegal activity or that he was trying to make a report of illegal activity. In other words, there is a factual dispute as to whether Emery knew that Foster had engaged in protected conduct. In addition, although Foster

arguably reported illegal conduct to Emery on September 29, 2020 when he told Emery that MasTec employees were dumping raw sewage into a stormwater drain, Emery testified that Foster told him this *after* Emery had already decided to terminate his employment and had communicated that decision to Foster. Thus, under MasTec's version of the facts, there was no possible causal connection between Foster's termination and his subsequent report of illegal activity.

The plaintiff's assertion that he is entitled to summary judgment on the elements of his *prima facie* case—and that Emery's version of events should be disregarded—because "the plain language of the *prima facie* element[s] only evaluates the employee's actions for determining protected conduct" (Doc. No. 31, at 14) is simply incorrect. The elements of a *prima facie* case are meant to be easy for the plaintiff to establish for purposes of *avoiding* summary judgment in favor of the defendant. When the defendant moves for summary judgment, the plaintiff only has to present facts that, if proven, would establish the elements of his *prima facie* case. The plaintiff, however, bears the burden of proof at all times. Thus, when the *plaintiff* seeks summary judgment, he must show that there is no material factual dispute as to each element of a TPPA claim: that he engaged in protected activity, that the defendant knew he had engaged in protected activity, and that he was terminated *solely* because of that protected activity. In this case, the defendant has established the existence of a material factual dispute as to each of these elements.

The plaintiff also argues that Emery's proffered reason for the termination—that the plaintiff had yet again violated MasTec's Recording policy—has been "disproven and discredited." (Doc. No. 31, at 16.) The court has no reason even to reach this question, because there is a material factual dispute as to whether Emery knew that Foster had engaged in protected conduct both when he made the decision to terminate Foster and when he communicated that decision to Foster—and thus a factual dispute as to whether the termination was solely because of

the protected activity. Moreover, even if the plaintiff is correct that he did not actually violate the Recording policy, that fact would not eliminate the possibility that Emery reasonably and honestly believed that Foster had violated the policy and that the decision to terminate Foster was premised upon that belief. *See Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285–86 (6th Cir. 2012) ("[T]he falsity of [a] [d]efendant's reason for terminating [a] plaintiff cannot establish pretext as a matter of law under the honest belief rule. As long as the employer held an honest belief in its proffered reason, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless." (internal citations and quotation marks omitted)).

In short, the plaintiff is not entitled to summary judgment.

## V.   CONCLUSION

For the reasons set forth herein, both Motions for Summary Judgment will be denied. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge